KASO et al.

v.

**OHIO DEPARTMENT OF HEALTH.**

2003-Ohio-2997.]

Court of Claims of Ohio.

No. 2001–09036.

Decided May 12, 2003.

Robert G. Palmer, for plaintiffs.

Jim Petro, Attorney General, and Anne Berry Strait, Assistant Attorney General, for defendant.

---

EVERETT BURTON, Judge.

{¶ 1} Plaintiffs Megan Kaso et al. brought this action against defendant, alleging claims of negligence, nuisance, and trespass. Additionally, plaintiff Michael Kaso has asserted a claim for loss of consortium. The issues of liability and damages were bifurcated, and the case proceeded to trial on the issue of liability.

{¶ 2} Plaintiffs' claims arise from an oral rabies vaccine ("ORV") program that was initiated in Northeastern Ohio in the spring of 1997. The program was developed by the Ohio Rabies Task Force to combat a rabies epizootic (epidemic among animals) that had begun in the late 1970s and primarily infected raccoons along the eastern coast of the United States. Over the years, raccoons carried the disease to other wildlife, household pets, and livestock. Eventually, the disease spread westward across Pennsylvania and into Ohio.

{¶ 3} The Rabies Task Force was formed by defendant, the Ohio Department of Health ("ODH"), in conjunction with various other state and federal agencies. The Director of ODH authorized the use of the vaccine program. Four counties were targeted: Trumbull, Columbiana, Ashtabula, and Mahoning. Vaccine packets enclosed in a fish-meal bait were widely distributed in those counties during the spring and fall of each year from 1997 to 2001. In residential areas, ground crews consisting of local county employees and volunteers distributed the packets

by hand. In rural areas, they were dropped from low-flying aircraft. The bait-distributors were trained by ODH. Additionally, an ODH coordinator determined the areas where the packets would be distributed and the total number that would be placed. The overall program was directed by the ODH State Public Health Veterinarian.

{¶ 4} Plaintiffs were residents of Trumbull County, Ohio. On September 9, 2000, plaintiff Megan Kaso observed the family pet, a mixed-breed German shepherd, chewing on an object that was later identified as a vaccine bait. ODH ground crews had distributed baits in the area earlier that day. When Megan attempted to remove the bait from the dog's mouth, she was bit on one of her fingers and, in the struggle, the dog scratched her forearms. Megan was 15 weeks' pregnant at the time and had a skin condition known as epidermolytic hyperkeratosis. She subsequently developed an extreme skin reaction.

{¶ 5} Plaintiffs do not challenge defendant's official judgment in conducting the ORV program. Rather, they contend that defendant violated its duty to avoid placement of baits in places such as their backyard, and to train the bait distributors to avoid placing the baits in such areas. It is plaintiffs' position that ODH was negligent in its distribution of the bait and that placement of it on their private property constituted both a trespass and a nuisance.

{¶ 6} With regard to the claim for negligence, plaintiffs must prove by a preponderance of the evidence that defendant owed them a duty, that it breached that duty, and that the breach proximately caused the alleged injury. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 285, 21 O.O.3d 177, 423 N.E.2d 467. The extent of the duty owed depends upon the foreseeability of the injury. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 472 N.E.2d 707. The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. Id. at 77, 15 OBR 179, 472 N.E.2d 707, citing *Freeman v. United States* (C.A.6, 1975), 509 F.2d 626; *Thompson v. Ohio Fuel Gas Co.* (1967), 9 Ohio St.2d 116, 38 O.O.2d 294, 224 N.E.2d 131; *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 41 O.O. 117, 90 N.E.2d 859.

{¶ 7} Heather Merritt and Tracy Dean were the two individuals who distributed baits in plaintiffs' neighborhood on September 9, 2000. Merritt was a specialist in wildlife rehabilitation and also worked as a volunteer for the Trumbull County Rabies Task Force. Dean was a health educator with the Trumbull County Health Department. Both women provided their services pursuant to the terms of an Ohio financial grant that required local county health departments to provide staff for the ORV baiting program. Richard Hale was, at the time, the ODH coordinator for the ORV program. Plaintiffs called all three of these individuals to testify at trial. Each of the witnesses testified regarding

the methods used for bait distribution and the training provided for ground-crew bait distributors.

{¶ 8} The basic bait distribution method was fairly simple: the ground crews divided into teams and rode in vehicles, with one person driving and the other tossing baits out the window into the designated areas. If necessary, the distributors would also walk through certain areas to ensure that the baits were most effectively placed. The distributors would also get out of their vehicles to reposition baits that did not land in a desired area.

{¶ 9} In accordance with the bait manufacturer's Material Safety Data Sheet ("MSDS") (Joint Exhibit R), distributors were required to wear gloves that were impervious to vaccine chemicals in order to minimize contact with the vaccine and otherwise to wear light-weight protective clothing. The MSDS warns that the vaccine is potentially hazardous to health if ingested or "if broken skin is exposed to infectious fluids or tissues." The data sheet further advises that "localized skin lesions are possible" and that "young children, pregnant women, individuals with immune deficiencies or those on steroids should avoid contact with [the] vaccine." Thus, it was recommended that only nonpregnant women and individuals over the age of 18 be permitted to distribute baits.

{¶ 10} With respect to the question of where to bait, the ground crews were trained at a large group meeting, led by Hale, and were also required to view a training film: "Think Like A Raccoon," which was narrated by Kathy Smith, the State Public Health Veterinarian and Director of the ORV program.[1] The basic objective was to place the baits in areas that were likely raccoon habitats or where raccoons were likely to look for food. The crews were provided with information packets that reiterated their basic training. For example, a form captioned "Important Bait Distribution Information" (Joint Exhibit V) includes the following synopsis:

"Areas to Target

"Edges of wooded areas

"Edges of farm fields

"Swamp/wetland edges

"Streams, ditches, and rivers (look to the road ahead for guardrails)

"Accessible trash cans and Dumpsters

"Look behind restaurants and groceries in particular

"Alleys, behind buildings and side streets

"Hollow trees

---

1. The training film "Think Like A Raccoon" was submitted as Joint Exhibit FF and was viewed by the court subsequent to the liability trial.

"Railroad tracks, particularly with brush along the side (try to find an access road or walk the tracks)

"Out-buildings that may provide a den space

"Near productive gardens/fruit trees/berries/grapes/etc.

"Areas to Avoid

"Open grassy areas

"Driveways and parking lots

"Manicured front lawns

"Backyards with toys for young children

"Backyards with dogs

"Single tree or bush in an open field or yard

"Manicured parks or playgrounds

"Nursery or elementary schools

"Heavy industrial or paved areas"

{¶ 11} The information packets also provide the distributors with area maps and bait-density specifications for their designated areas. The instructions included this precaution: "[P]lease make every effort to obtain the bait density that is on your area map. We have calculated the area and have given you the correct amount of bait for each area. *To do this you must pay special attention on where to bait and how much bait you are throwing, making sure that you get areas that may be less accessible by vehicle; in backyards, between homes, or behind buildings.*" (Emphasis added.)

{¶ 12} Plaintiffs' premise their negligence claim on the argument that theirs was a "neatly manicured" yard that was unlikely to be a haven for raccoons, and that there was a dog on their property, which they contend should have been apparent from the invisible fencing "Pet Containment System" sign in their yard. (Joint Photographic Exhibits B through N.) Thus, plaintiffs contend that defendant had a duty according to its own specifications to avoid placement of baits in their yard. It is further their position that a reasonable, prudent person should have anticipated that injury was likely to result if baits were distributed in such places as plaintiffs' yard. Specifically, plaintiffs maintain that it was foreseeable that domesticated animals would be attracted to the baits and that pet owners would attempt to remove the baits from animals' mouths. Plaintiffs also allege that, based upon the information provided in the MSDS, defendant knew or should have known that the vaccine was potentially hazardous and that defendant was put on notice of other individuals and pets coming into contact with the vaccine because of reports received and telephone calls to its hot line.

{¶ 13} Defendant denied liability on all claims asserted in plaintiffs' complaint. In response to the negligence claim, defendant counters that the target-area instructions are merely guidelines to which the distributors were not duty-bound to adhere. Defendant also noted that an extensive public-awareness campaign was conducted with regard to the baiting project. Newspapers, radio, and television were involved in that campaign; hospitals, physicians, veterinarians, school-district officials, and law enforcement departments were provided with information needed to answer questions, allay fears, and treat exposure problems. There were public meetings in certain areas and a hot line was established. (Defendant's Exhibits R through W; Exhibit AA and Exhibit DD and testimony of Mary-jean Siehl, ODH Director of Public Affairs.) Each bait was labeled with an information sticker to discourage handling and to provide a toll-free telephone number for guidance in the event of accidental exposure.

{¶ 14} Information was widely distributed regarding the program: where and when the baiting was to take place, what the baits looked like, and what to do if baits were discovered on one's property. Moreover, the vehicles used by the bait distributors were clearly marked with signage stating "Official Raccoon Rabies Baiting Vehicle" (Exhibit DD), and the distributors carried pamphlets entitled "Questions and Answers About Oral Rabies Vaccine" to hand out if approached by citizens in their target areas. The distributors were further instructed to verbally answer questions freely upon request. Defendant elicited testimony from Merritt and Dean demonstrating that they both clearly had the training and experience to answer any such questions.

{¶ 15} With respect to placement of baits in plaintiffs' yard, neither Merritt nor Dean could remember the yard specifically or whether they had thrown any baits there. They both stated that they would not have thrown bait into the yard if they had seen the invisible fencing sign. However, Dean also testified that the area in plaintiffs' yard where the dog found the bait appeared to be a likely raccoon habitat.

{¶ 16} Photographic depictions of plaintiffs' property were presented to demonstrate that there were several areas that fit the target-area specifications. For example, the yard contained a low-lying ditch/drainage area in the rear, a vegetable garden, a large pile of brush, and an area of piled dirt left from a landscaping project. Defendant also presented expert testimony on this issue. Chris Dwyer, a wildlife biologist with the Ohio Department of Natural Resources, testified that he visited plaintiffs' neighborhood and found raccoons living in close proximity to their residence as well as evidence that raccoons traversed the area regularly.

{¶ 17} With respect to any danger connected with exposure to the vaccine, defendant presented extensive evidence regarding the potential for harm to

humans and domestic animals. Among others, Carolin Schumacher, D.V.M., Ph.D., the Associate Director of Rabies Control Programs for Merial Limited (the manufacturer of the vaccine in question), testified that the vaccine cannot *cause* rabies in either humans or pets. In addition to her other credentials, Dr. Schumacher had a lengthy history of biomedical research and had spent approximately five years working to develop the rabies vaccine with Virbac Laboratories in Carros, France. She had also served as an adviser to the World Health Organization since 1992. According to Dr. Schumacher, prior to plaintiffs' case, literally millions of doses of the vaccine had been distributed in the United States, Canada, and Europe with no adverse reactions reported in humans, pets, or wildlife.

{¶ 18} The lack of adverse effects and the extensive worldwide distribution of the vaccines were also corroborated by several other witnesses, including Dr. Forest Smith, Ohio's state epidemiologist, and Dr. Kathy Smith, the state public health veterinarian. Notwithstanding those statistics, ODH did have a contingency plan and treatment algorithm in place in the event that injury should occur. Defendant argued that the existence of a precautionary plan was not an acknowledgment that adverse affects were likely to occur. Similarly, testimony was presented to establish that the use of gloves and protective clothing was not an acknowledgment of any potential risk. The use of protective clothing was intended, in part, to prevent the human scent from being absorbed by the baits (thus discouraging raccoons from eating the bait) and to prevent the distributors from absorbing the highly offensive odor of the baits.

{¶ 19} Upon consideration of all of the evidence, testimony, and argument presented, and after assessing the credibility of the witnesses, this court concludes that plaintiffs have failed to prove that defendant breached any duty owed to them. To the extent that the existence of a duty depends upon foreseeability, the court cannot find that the injury suffered by Megan Kaso was foreseeable to a reasonable, prudent person. The foreseeability of harm usually depends on the defendant's knowledge. *Thompson v. Ohio Fuel Gas Co.* (1967), 9 Ohio St.2d 116, 38 O.O.2d 294, 224 N.E.2d 131. In determining whether defendant should have recognized the risks involved, only those circumstances that it perceived, or should have perceived, at the time of its respective actions should be considered. Prosser & Keeton Law of Torts (5th Ed.1984) 169, Section 31. Here, the court is persuaded that, based upon the millions of baits distributed with no adverse effect on humans, pets, or wildlife, defendant could not have perceived, nor should it have perceived, that harm of the nature suffered by Megan Kaso was likely to occur. Specifically, the court does not find that it was foreseeable that an individual would exert effort to the point of personal injury

while attempting to remove a harmless vaccine bait from a pet's mouth, or fail to wash the affected area with soap and water after injury had been sustained.

{¶ 20} Additionally, the court can find no authority imposing a duty upon defendant to strictly adhere to the bait-distribution guidelines. The court notes that the guidelines conflict to some extent with the mandates issued to distributors regarding achievement of the required bait density. For example, the guidelines state that backyards should be avoided whereas the density requirements state that distributors must "mak[e] sure that you get areas that may be less accessible by vehicle; in backyards, between homes." In the court's view, mere reading of the instructions demonstrates that a certain amount of individual judgment was required in the placement of baits; certainly, if it were simply a matter of rote memorization of strict requirements, individuals with the experience and background of Merritt and Dean would not be needed to perform the work.

{¶ 21} Moreover, even if the guidelines did impose some degree of duty upon defendant, the court cannot find that defendant breached such duty in the placement of the vaccine baits. While plaintiffs' yard may have fit some of the criteria for "areas to avoid," it also fit some of the criteria for "areas to target"; that is, as noted above, areas targeted to ensure that sufficient density was achieved. In addition, there was testimony that the baits could have been picked up by other animals and carried into places where they would typically not have been thrown.

{¶ 22} Finally, the court must also consider Ohio's comparative negligence statute, R.C. 2315.19. Pursuant to that statute, plaintiffs are barred from recovery if their contributory negligence is greater (more than 50 percent) than defendant's. In this case, even if Merritt and Dean did, in fact, throw baits into plaintiffs' yard, the public awareness campaign conducted in advance of the program should have alerted plaintiffs that the baits were not harmful if ingested by pets and that simply washing with soap and water would prevent any risk of skin irritation to humans exposed to a damaged vaccine packet. Plaintiffs' argument that they were not aware of the baiting program and did not watch television or read newspapers was disingenuous. Even if that argument were worthy of belief, the decision to ignore public information is a personal choice and not a breach of any duty that can be attributed to defendant.

{¶ 23} Perhaps most persuasive, however, is the evidence that plaintiffs had found a bait in their yard the previous year and that they contacted the police after their dog ingested one. They were told at that time that the baits were not harmful if swallowed by pets. Thus, when Megan struggled to remove the bait

from her pet's mouth in September 2000, she knew or should have known that it was not necessary to do so to prevent injury to her pet.

{¶ 24} For these reasons, the court concludes that defendant was not negligent and that, even if some negligence could be found, plaintiff Megan Kaso's contributory negligence outweighs that of defendant.

{¶ 25} Plaintiffs' next theory of recovery is that of nuisance. Nuisance is "a distinct civil wrong, consisting of anything wrongfully done or permitted which interferes with or annoys another in the enjoyment of his legal rights." *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 436, 28 O.O. 369, 55 N.E.2d 724. Under Ohio law, a nuisance has been classified as one of the following: (1) an absolute nuisance, which imposes strict liability, or (2) a qualified nuisance, which depends on proof of negligence. Id. at paragraphs two and three of the syllabus. The Supreme Court of Ohio defined the difference between an absolute nuisance and a qualified nuisance in *Metzger v. Pennsylvania, Ohio & Detroit RR. Co.* (1946), 146 Ohio St. 406, 32 O.O. 450, 66 N.E.2d 203, paragraphs one and two of the syllabus:

{¶ 26} "1. An absolute nuisance, or nuisance per se, consists of either a culpable and intentional act resulting in harm, or an act involving culpable and unlawful conduct causing unintentional harm, or a nonculpable act resulting in accidental harm, for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault.

{¶ 27} "2. A qualified nuisance, or nuisance dependent on negligence, consists of an act lawfully but so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another. [*Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 28 O.O. 369, 55 N.E.2d 724, approved and followed.]"

{¶ 28} In the present case, there are no facts that would support a theory of absolute nuisance. Thus, although plaintiffs have not specified a form of nuisance in their complaint, the court interprets their allegations to assert a claim under the theory of qualified nuisance. Based upon the definition above, that form of nuisance depends upon a finding of negligence. The court having found that defendant was not negligent in its placement of vaccine baits, it follows that plaintiffs cannot establish a prima-facie case of qualified nuisance.

{¶ 29} Plaintiffs' last theory of recovery is one of trespass. Simply stated, trespass consists of entry upon the property of another "without right, lawful authority, or express or implied invitation or license." 76 Ohio Jurisprudence 3d (1987), Section 6. Here, defendant clearly had lawful authority to conduct the ORV program. While the court has found that defendant was not negligent in its placement of vaccine baits, even assuming that the baits were

intentionally thrown upon plaintiffs' property, the court cannot find that such act constitutes a trespass. R.C. 3701.14(A) imposes a duty upon ODH to take action to control and suppress infectious diseases: "The director of health shall make inquiry as to the cause of disease, especially when contagious, infectious, epidemic, or endemic, and take prompt action to control and suppress it. * * * The director may *make and execute orders necessary to protect the people against diseases of lower animals,* and shall collect and preserve information in respect to such matters and kindred subjects as may be useful in the discharge of the director's duties, and for dissemination among the people. * * *" (Emphasis added.)

{¶ 30} The evidence presented at trial is replete with references to the seriousness of the rabies disease. It was well established that there is no known cure for the disease and, unless treated promptly, it is fatal in humans. Because the disease is easily spread animal-to-animal, one of the main objectives of the ORV program was to limit the exposure of domestic animals to rabid wild animals. However, the ultimate goal of the program was to protect the human population, because humans can contract the disease from infected animals. For these reasons, the court finds that defendant had a lawful duty to distribute baits and that any placement of the same on plaintiffs' property was not a trespass.

{¶ 31} As a result of the findings and conclusions set forth above, the court determines that plaintiffs have failed to prove any of the claims asserted in their complaint. Accordingly, Michael Kaso's loss-of-consortium claim must also fail. Judgment shall therefore be rendered in favor of defendant.

{¶ 32} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

Judgment for defendant.

EVERETT BURTON, J., retired, of the Scioto County Court of Common Pleas, sitting by assignment.